## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ADAMS RESOURCES EXPLORATION | ) | Case No. 17-10866 (KG) |
| CORPORATION, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

## DECLARATION OF JOHN RINEY IN SUPPORT OF
## CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

John Riney ("Riney"), being duly sworn, deposes and says:

1.      On April 21, 2017 (the "Petition Date"), Adams Resources Exploration

Corporation ("AREC") or "Debtor"), as debtor and debtor in possession in the above-captioned

case, commenced a case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§

101, et seq. (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of

Delaware (the "Court").

2.      I currently serve as a director and as the President of AREC. I have served in this

capacity since October 1, 2016.  I have become familiar with the Debtor's history, day-to-day

operations, business and financial affairs, and books and records, as well as the Debtor's pre-

petition efforts to market its assets for sale.

3.      The Debtor continues to operate its business and manage its properties as debtor

in possession pursuant to sections 1107(a) and 1109 of the Bankruptcy Code.

4.      I submit this Declaration (the "Declaration") to assist the Court and the other

parties in interest in understanding the circumstances that compelled the commencement of the

chapter 11 case and in support of the first day motions and applications filed in the case (the

"First Day Motions").  Except as otherwise indicated, all facts set forth in this Declaration are

based upon my personal knowledge, information provided to me by certain of the Debtor's

employees, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the operations and financial affairs of the Debtor.  If I were called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration.

5.    On the Petition Date, the Debtor filed a voluntary petition with the Court for relief under chapter 11 of the Bankruptcy Code. To minimize the adverse effects of filing for chapter 11 protection and facilitate a prudent restructuring process that preserves value and enhances the Debtor's ability to successfully market and sell its assets as a going concern and confirm a corresponding chapter 11 plan, the Debtor has filed a number of pleadings requesting various kinds of "first day" relief (collectively, the "First Day Pleadings") concurrently with the filing of this declaration (this "Declaration").

6.    I am familiar with the contents of each First Day Pleading (including the exhibits and other attachments to such motions) and, to the best of my knowledge, after reasonable inquiry, believe the relief sought in each First Day Pleading: (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption; (b) is critical to the Debtor's efforts to preserve value and pursue a successful going concern sale of the assets; and (c) best serves the Debtor's estate and creditors' interests. Further, it is my belief that the relief sought in the First Day Pleadings is narrowly tailored and necessary to achieve the goals of this chapter 11 case.

7.    This Declaration is divided into two sections.  Section I provides a brief description of the Debtor's current organizational structure and operations, its current financial condition, and the events giving rise to this case.  Section II sets forth those facts that are most germane to this Court's determination of the Debtor's various motions for first day relief and is

intended to supplement any other declarations or affidavits submitted in direct support of such motions.

## I.
## THE DEBTOR'S BUSINESS

### A.    History:

8.    The Debtor was founded by K.S. "Bud" Adams in 1967 as an oil and gas exploration and production company.  Early in its existence, the Debtor was actively involved in oil and gas exploration and development, generated prospects, and served as the operator of a number of leases/wells. Accordingly, the Debtor employed a number of experienced and knowledgeable industry experts, such as Petroleum Engineers, Geologists, and other exploration and production professionals.  As the Debtor's key professionals retired, left the company, and passed away, AREC later shifted its emphasis from prospect generation and operation to ownership of non-operating working interests in leases/wells operated by other companies.

9.    In 2016, the Debtor's President and its Treasurer both retired.   Its former President had been with the Debtor since approximately 1997 and had approximately forty-six (46) years of experience as a Petroleum Engineer.  Its former Treasurer is a CPA who had been with the Debtor since approximately 1984.

10.    The Debtor currently has five (5) employees, primarily consisting of support personnel, such as field supervisors, revenue accountants, joint interest accountants and production secretaries.

### B.    Oil and Gas Interests:

11.    Currently, the Debtor owns lease interests in Texas, Louisiana, Oklahoma, Kansas, Montana, and Arkansas. As of December 31, 2016, the Debtor owned fractional interests in approximately 470 wells (13.5 net wells).   The Debtor operated six (6) of those wells;

however, all wells operated by the Debtor have been plugged and abandoned as of March 31, 2017.

12.    The relationships of the operator and non-operators for each of the leases in which the Debtor has an interest are governed by operating agreements.

13.    As of December 31, 2016, the Debtor had estimated proved reserves of approximately 889 thousand barrels of oil equivalents (MBOE), comprised of 4.214 billion cubic feet (BCF) of natural gas and 186.7 thousand barrels (MBO) of oil and condensate.[1]   The discounted future net income attributable to the Debtor's reserves was estimated to be approximately $3,477,400 as of December 31, 2016.[2]

C.    **Corporate Governance and Ownership:**

14.    The Debtor is incorporated in Delaware.  It has issued 10,000 shares of common stock, all of which are owned by Adams Resources & Energy, Inc.  Adams Resources & Energy, Inc. is a publicly traded company (symbol: AE) incorporated in Delaware.[3]

15.    The Debtor is governed by a Board of Directors comprised of two (2) Directors, Sharon Davis and John Riney.  The Debtor has the following Officers: (i) John Riney, President; (ii) Sharon Davis, Treasurer; (iii) David Hurst, Secretary; (iv) James Quinn, Assistant Secretary; and (v) myself as Chief Financial Officer.

16.    The Debtor is in good standing with the Delaware Department of State.

---

[1] Ryder Scott Company, L.P., Estimated Future Reserves and Income Attributable to Certain Leasehold Royalty Interests, as of December 31, 2016.
[2] *Id.*
[3] Adams Resources & Energy, Inc. has nine (9) other wholly-owned subsidiaries which operate business segments distinct from oil and gas exploration and development.

## II
## EVENTS LEADING TO THE COMMENCEMENT
## OF THE CHAPTER 11 CASE

**A.    Prepetition Capital Structure:**

17.    <u>Intercompany loans.</u>  As of the Petition Date, the substantial majority of the Debtor's indebtedness is owed to Adams Resources & Energy, Inc. pursuant to intercompany loans in the amount of $57.2 million.  These amounts have been funded by Adams Resources & Energy, Inc. over a period of time to fund the Debtor's operating cash flow shortfalls and necessary operating expenses through extended periods of non-profitability.

18.    <u>AFEs and JIBs.</u>  As of the Petition Date, the Debtor owes approximately $767,000 in approved and unfunded Authorizations for Expenditure ("AFEs") and Joint Interest Bills ("JIBs").

19.    <u>Royalty obligations.</u>  The Debtor owes ongoing royalty obligations to the fee owners of property subject to its lease interests.  Some royalty obligations are paid by the Debtor from the revenues it receives on account of its lease interests, and some are paid on behalf of the Debtor by the operators of wells in which the Debtor has an interest before the proceeds of the Debtor's hydrocarbon production are delivered to the Debtor.  With respect to those royalty obligations paid by the Debtor, on April 19, 2017, the Debtor paid approximately $11,000 to 36 royalty owners based on revenues received for the month of March 2017.   As of the Petition Date, the Debtor believes that it is current on royalty payments.

20.    <u>Trade debt.</u>  In the ordinary course of producing oil and gas from its properties, the Debtor has historically obtained goods and services from over 140 vendors. As of the Petition Date, the believes it is current on its trade debt and other operating expenses, as these have been

funded by Adams Resources & Energy, Inc. through the above-referenced intercompany loans as needed.

21.    <u>Decommissioning obligations</u>.    The Debtor also owes regulatory decommissioning obligations[4] in proportion to its working interest in its leases and wells.  The decommissioning obligations are owed to the state regulatory bodies with oversight of oil and gas operations.[5]  Much of Debtor's decommissioning obligations have not yet become due and will not become due until leases/wells have become non-productive.  As of the Petition Date, the Debtor believes it is current on its decommissioning obligations.

22.    <u>Other debt</u>.  The Debtor is obligated for litigation support costs (court reporting services, copy services, expert witnesses, etc.) in an unknown amount as of the Petition Date in connection with the "Sinkhole Litigation," discussed in **Part II.B.** of this Declaration.

23.    <u>Lease obligations</u>.  The Debtor's office space is leased from Adams Resources & Energy, Inc., for approximately $10,559 per month, inclusive of utilities, taxes, and insurance. The Debtor was current on its lease obligations as of the Petition Date.

**B.    Events Leading To the Chapter 11 Filing**

24.    This filing is brought about by several factors, including: (i) The Debtor's desire to facilitate a marketing and sale of its remaining exploration and production assets; (ii) financial and operational challenges experienced by the Debtor in recent years; and (iii) other factors.

---

[4] These obligations include plugging and abandoning, site clearance, cleanup, and other decommissioning obligations.

[5] The expenses of decommissioning in compliance with regulations and lease requirements are shared by the interest owners of the lease/well in proportion to their respective ownership interest.  For those leases/wells it operates, the Debtor is the party responsible for insuring compliance with the decommissioning obligations, and in many cases has posted bonds securing those obligations.  In those cases, the Debtor will send an AFE or Joint Interest Bill ("JIB"), as applicable, to the working interest owners for their respective shares of the decommissioning expenses.  In those cases where the lease/well is operated by another company, the Debtor will receive an AFE or JIB, as applicable, for its working interest share of the decommissioning expenses.

25.    <u>Marketing and sale efforts</u>.  Over the past several years, the Debtor has carried out several asset dispositions in an effort to respond to market conditions and improve the company's financial performance.

26.    The Debtor's most recent disposition of lease interests were in 2012 and 2014.  In 2012, the Debtor sold certain producing properties to Jonder Exploration, SV Resources Partners, Seneca Resources, and Chevron U.S.A. for a purchase price of $4.1 million, representing a net gain of $2.5 million.

27.    In 2014, the Debtor sold additional assets to Obloen Resources, Penn Virginia, Tanos Energy, and Red Rocks Energy Partners for $3.6 million, representing a net gain of $2.2 million.

28.    In 2016, the Debtor informally discussed a potential sale of the remainder of its producing properties with prospective buyers.  While these discussions generated some interest among potential buyers, the Debtor's management determined that a formal marketing process might assist in maximizing the value received by the Debtor for the assets.

29.    Over the past several months, I have interviewed and placed inquiries with a number of brokers and investment banks.  On April 19, 2017, the Debtor entered into an agreement with the Oil & Gas Asset Clearinghouse (the "Broker") to conduct the marketing and sale of the Debtor's assets, subject to the Court's approval of the Broker's engagement in this case.

30.    It is the Debtor's belief that the marketing and sale of its assets in this bankruptcy case will maximize value to the estate and the recovery of the Debtor's creditors.

31.    <u>Financial and operational challenges</u>.  The downturn in the exploration and production industry has significantly impacted the Debtor's ability to cash flow through

operations.   The Debtor has operated at a loss in years 2014, 2015, and 2016.   Despite management's efforts to correct this trend, industry conditions have prevented a successful turnaround.

32.     Low commodity prices have caused broad-ranging distress in the oil and gas industry. West Texas Intermediate ("WTI") crude oil spot prices have fallen from a monthly high of approximately $105 per barrel in June of 2014 to approximately $51 per barrel as of the Petition Date, reaching prices as low as the $25 range during this period. In 2016, the Debtor's averaged realized price was just over $38 per barrel.[6]

33.     Natural gas prices have also fallen significantly. The Debtor's average price per Mcf in 2016 was $2.26, compared to $4.65 in 2014.

34.     These declines in commodity pricing led to continued curtailment of drilling in most areas, as the expenditures required for drilling render it not economically feasible at suppressed prices.   Thus, as a result of pricing declines, the Debtor did not participate in any exploratory wells in 2016.   The Debtor participated in one (1) dry hole in 2015 and four (4) dry holes in 2014.

35.     The Debtor's participation in development well drilling has also declined significantly since 2014.   By way of comparison, during the period of advantageous pricing in 2014, the Debtor participated in forty-six (46) development wells.   The Debtor participated in thirteen (13) development wells in 2015, and, as prices declined further, only seven (7) development wells in 2016.

36.     As a result of reduced drilling activity, the Debtor's annual production has declined significantly.   Production of 187,000 barrels of crude oil in 2016 represents a decline of

---

[6] Ryder Scott Reserve Report as of December 31, 2016, Ex. 99.1 to 2016 10-K.

approximately 41.2% from 2014 production.  Natural gas production in 2016 also declined by approximately 25% compared to 2014 levels.

37.    The Debtor's revenues are a function of: (i) crude oil and natural gas prices and (ii) production volumes.  The combination of reduced prices and reduced production volumes necessarily leads to reduced revenue.  Specifically, these industry dynamics caused the Debtor's revenues to fall 44% in 2016 relative to 2015 performance.  When compared to 2014, 2016 revenues were down 74.5%.

38.    The Debtor has generally been unable to fund its operations from cash flow.

39.    <u>Liquidity needs</u>.  The Debtor's election to participate in certain development wells in the Permian Basin requires the Debtor to satisfy JIBs in order to remain a participating party with respect to those wells and derive future financial benefit from the wells.  In the Debtor's business judgment, participation in these wells is critical to maximizing the value of the Debtor's assets and lease interests.  Should the Debtor be deemed a "non-consenting" (non-participating) party with respect to the wells, the Debtor will be subject to significant "non-consent" penalties, which will severely and negatively impact the value of its assets.  In the absence of access to capital through the proposed DIP facility, the Debtor does not have the funds to satisfy these JIBs, the earliest of which becomes due on or about April 23, 2017.

40.    <u>Litigation expenses.</u>  The Debtor's cash flow challenges have been compounded by significant litigation expense associated with claims asserted against the Debtor and others in lawsuits filed in Louisiana ("<u>Sinkhole Cases</u>").

41.    The Sinkhole Cases emanate from the 2012 collapse of an underground solution mining cavern operated by Texas Brine Company, LLC ("Texas Brine") in Napoleonville, Louisiana.  The collapsed brine cavern was drilled and developed by Texas Brine near the edge

of the Napoleonville Salt Dome.  When the cavern collapsed, a large sinkhole manifested itself at the surface and eventually grew to approximately 37 acres in size and 750 feet in depth (the "Sinkhole").

42.    The Sinkhole's emergence triggered a State of Emergency, required emergency evacuation of residents, allegedly damaged a number of pipelines in the area, allegedly caused surface, subsurface, and other damage to surrounding landowners, and allegedly caused damages to the State of Louisiana, the Assumption Parish Sheriff, and the Assumption Parish Police Jury. The Sinkhole Cases are comprised of ten (10) separate lawsuits, nine (9) of which are pending in Assumption Parish, Louisiana, and one (1) of which is pending in the Eastern District of Louisiana awaiting trial on class certification.

43.    The Debtor operated a legally permitted and approved oil and gas well in the area of the Sinkhole between January 1986 and May 1, 1986 and owned a non-operating working interest in the well between May 1, 1986 and August of 2001.  The Debtor was brought into the Sinkhole Cases via a third-party demand filed by Texas Brine, in which Texas Brine alleges that the production of oil and gas between June of 1986 and 2001 depleted reservoir pressure which "caused or contributed to" the collapse of the brine cavern and development of the Sinkhole. Texas Brine has asserted causes of action for reimbursement of any amounts for which it is cast in judgment to the various plaintiff constituencies pursuant to contribution and tort indemnity theories, as well as a "first-party" claim for Texas Brine's own alleged damages.

44.    The Debtor maintains that there is no merit to Texas Brine's claims; however, the multiplicity of Sinkhole Cases, coupled with the highly scientific nature of both fact and expert evidence, the thirty-year history of the brine cavern, and the millions of documents produced in the cases has resulted in significant fees and costs to defend.  Several of the Debtor's former

insurers have previously gone insolvent and through receivership proceedings, and its more recent insurers have denied coverage.

45.     In light of all of the foregoing, the Debtor has determined that a structured sale of its assets as a going concern pursuant to 11 U.S.C. § 363 and an attendant plan process will maximize its ability to address its royalty obligations, its regulatory decommissioning obligations, its joint account obligations, and claims of its trade creditors and general unsecured claimants.

### III.
### FIRST DAY PLEADINGS

46.     Concurrently with the filing of this Declaration, the Debtor is filing a number of first day motions.  The Debtor anticipates that the Court will conduct a hearing soon after the commencement of the Debtor's chapter 11 cases (the "First Day Hearing"), at which time the Court will hear the First Day Motions.  For those motions being heard at the First Day Hearing, the relief requested therein is necessary and appropriate under the circumstances as the Debtor will suffer irreparable harm if any of the relief requested is not granted.

47.     Generally, the First Day Motions have been designed to meet the goals of: (a) continuing the Debtor's operations in chapter 11 with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of the Debtor's suppliers, employees, and certain other key constituencies; and (c) establishing procedures for the smooth and efficient administration of these cases.

48.     I have reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve a successful reorganization.  I also believe that the matters addressed in the First Day Motions are of a

genuinely emergent nature, and that the relief requested in the First Day Motions is required to preserve the assets of the Debtor's estate and to maintain the Debtor's ongoing business operations.  Moreover, I believe, as further described below, that the failure to immediately address the issues set forth in the First Day Motions will have extremely adverse effects on the Debtor, its estate, and its creditors.

> **A.    Motion For Interim And Final Orders (1) Authorizing Debtor in Possession to Obtain Post-Petition Financing; (2) Authorizing Debtor in Possession to Use Cash Collateral; (3) Providing Adequate Protection; and (4) Granting Liens, Security Interests and Superpriority Claims ("<u>DIP Loan Motion</u>")**

49.    The Debtor files the DIP Loan Motion for approval of an interim and final order to approve a debtor in possession financing facility extended by Adams Resources & Energy, Inc. ("DIP Lender"), as well as for agreed use of post-petition cash collateral pursuant to the agreed Budget (as defined below).  The debtor in possession financing facility and use of post-petition cash collateral will allow the Debtor to cover its necessary operating expenses and ensure continued normal business operations, and to preserve and enhance the value of the Debtor's assets.

50.    By this Motion, the Debtor requests authority to enter into the DIP Facility on an interim basis (and subject to the Final Hearing, on a final basis), by which the DIP lender, will provide a postpetition loan to the Debtor up the amount of $580,000 and $1,250,000 on a final basis (each, a "<u>DIP Loan</u>"; and collectively, the "<u>DIP Loans</u>"), <u>provided</u>, <u>however</u>, that the Debtor shall use the proceeds of the DIP Loans solely in compliance with the budget attached to the DIP Loan Motion as **Exhibit A thereto** (the "<u>Budget</u>").

51.    The preservation of value of the Debtor's business hinges upon obtaining access to post-petition financing.  The Debtor uses cash on hand and cash flow from operations to satisfy payroll, pay suppliers, meet overhead, and make any other payments that are essential for

the continued management, operation, and preservation of the Debtor's businesses. The ability to satisfy these expenses as and when due is essential to the Debtor's continued operation of their businesses during the pendency of these cases.  Without access to post-petition financing the Debtors and their estates would suffer immediate and irreparable harm, by, among other things, being unable to pay on-going joint interest billings and other expenses associated with maintaining oil and gas revenues and preserving the value of Debtor's oil and gas interests.

52.     Without the DIP Loan, the Debtor will be unable to pay its necessary preservation and maintenance costs, payroll and other operating expenses, and obtain goods and services needed to preserve its assets in a manner that will avoid irreparable harm to the Debtor's estate.

53.     The Debtor's ability to finance the preservation and maintenance of its assets and the availability of sufficient liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations as provided herein are vital to the preservation of the estate and maintenance of the going concern value of the Debtor's estate.  Most critically, the next payroll is April 28, 2017.  The next joint interest billings ("JIBs") are due on April 28, 2017. Failure to pay JIBs could result in the Debtor being deemed "non-consent" for new wells, which will decrease the value of those assets and potential revenues.  Failure to pay JIBs could also subject the Debtor to setoff and recoupment rights, reducing potential revenues.   These obligations must be paid to preserve the value of the Debtor's assets.

54.     The DIP Lender has indicated its willingness to provide the DIP Loans and allow the use of Cash Collateral as set forth in the Budget, subject to the terms and conditions set forth in the Interim Order.  The DIP Lender's lending of the DIP Loans is conditioned upon the grant of a first priority lien on the Debtor's unencumbered property and a junior lien on property subject to any prior valid and properly perfected liens and subject to the Carve-Out.

55.     The terms of the DIP Loan and use of Cash Collateral have been negotiated in good faith and at arm's length between the Debtor and the DIP Lender.  The Debtor has determined that it is unable to obtain emergency financing in another manner, or on any terms superior to those in the Interim DIP Loan.  The Debtor submits that entering into the Interim DIP Loan is necessary to fund its post-petition operating expenses and allow the Debtor to successfully reorganize.  Given the exigencies of the case, the Debtor believes the DIP Facility is the best and only option.

56.     The terms for the proposed DIP Facility and use of Cash Collateral are set forth in the Interim Order and the principal terms are summarized as follows:

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| **DIP Loan Parties**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Borrower: Adams Resources Exploration Corporation<br><br>Lender: Adams Resources & Energy, Inc. | Interim Order Introduction |
| **Amount of Borrowing**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | An amount not to exceed $580,000 on an interim DIP loan, and on a final basis, an amount not to exceed $1,250,000 | Interim Order, ¶ 2 |
| **Purpose / Use of Funds**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(ii)*<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | The Debtors seek authority to use the proceeds of the DIP Loan for, among other things, (i) working capital requirements; (ii) general corporate purposes; and (iii) the costs and expenses of administering the chapter 11 cases, in each case pursuant to and in accordance with the 13-week cash collateral budget attached as Exhibit 1 to the Interim Order (as the same may be updated in accordance with the terms of the Interim Order, the "Budget"). | Interim Order, ¶ 2 |
| **Interest Rate**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | Drawn Amounts: LIBOR + 200 bps per annum<br><br>Default Interest: The per annum interest rate equal to the sum of the interest rate otherwise applicable, plus 2% per annum. | Interim Order, ¶ 3 |
| **Fees**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Commitment Fee: None<br><br>Administrative Fees: Reimbursement of reasonable fees and expenses of the DIP Lender including, without limitation, of its counsel. | Interim Order, ¶ 3 |

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| **Maturity Date**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(ii)* | Earlier of (a) 12 months after the Petition Date, (b) the closing on a sale of substantially all of the Debtor' assets, (c) the effective date of a chapter 11 plan of reorganization of any of the Debtors, and (d) the date that the DIP Loan is accelerated, whether at stated maturity, upon the occurrence of an Event of Default or otherwise. | Interim Order, ¶ 3 |
| **Optional Prepayment** | Borrower may voluntarily prepay the principal of the Loans, in whole or in part, without premium or penalty, at any time. | |
| **Mandatory Prepayment** | Asset Sales: 100% of net cash proceeds of sales or disposition of any property or assets.<br><br>Insurance Proceeds: 100% of net cash proceeds of insurance paid on account of any loss of any property or assets or in respect of any business interruption of the Debtors. | |
| **Events of Default**<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B) and (c)(1)(B)(iii); Local Rule 4001-2(a)(ii)* | Standard and customary events of default for financings of this type, including, without limitation:<br>• non-payment of principal, interest and fees;<br>• breaches of representations and warranties;<br>• defaults under affirmative and negative covenants;<br>• defaults with respect to post-petition debt or any take-or-pay contract entered into post-petition;<br>• termination, revocation or invalidity of any DIP Loan or guaranty thereunder;<br>• unstayed judgments in excess of specified amounts;<br>• impairment of security interests in the DIP Collateral;<br>• a Debtor's application or the entry of an order, in either case without the prior written consent of the DIP Lender, for the appointment of a trustee or examiner with enlarged powers under the Bankruptcy Code;<br>• entry of an order dismissing a Case or converting a Case to a case under Chapter 7 of the Bankruptcy Code;<br>• violation of any Debtor of any provisions of the DIP Orders if such violation is adverse to the Lender;<br>• failure of Debtor to meet certain agreed upon Milestones relating to progress of these chapter 11 cases as to asset sales and/or a plan of reorganization;<br>• the Final Order shall not have been entered by the Court within 35 days from the entry of the Interim Order. | Interim Order, ¶ 18 |
| **Priority of DIP Liens and Effect on Existing Liens**<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B)(i), (ii) and (c)(1)(B)(i); Local Rule 4001-2(a)(i)* | The DIP Lender shall be granted security interests and liens, pursuant to sections 364(c)(2) and, to the extent such liens exist, 364(c)(3) of the Bankruptcy Code, payable from, and having recourse to, all of the pre- and post-property of the Debtor and its estate and all proceeds thereof, but excluding, any Avoidance Actions and Avoidance Proceeds (each as defined in the DIP Orders)), subject only to the Carve-Out. | Interim Order, ¶ 10 |

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| **Superpriority Claims** | Pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Obligations shall at all times constitute allowed senior administrative expense claims against the Debtor with priority over any and all other administrative expenses, including, without limitation, the kinds specified in sections 105, 326, 328, 330, 331, 503(b), 506(c) (with any claims arising under section 506(c) only subject to the entry of the Final Order), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code or otherwise, which shall be payable from and have recourse to all pre- and post-petition property of the Debtor and its estate and all proceeds thereof, except for Avoidance Actions and Avoidance Proceeds (each as defined in the DIP Orders), subject only to the Carve-Out. | Interim Order, ¶ 12 |
| **Covenants**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Affirmative, negative and financial covenants that are customary and appropriate for financings of this kind. | |
| **Budget**<br>*Bankruptcy Rule 4001(b)(1)(B)(ii)* | The Budget is defined above and attached as Exhibit 1 to the Interim Order.<br><br>No less frequently than every four weeks commencing on May 15, 2017, the Debtors shall file an updated Budget for the following 13-week period (each, a "<u>Proposed Budget</u>"). | Interim Order, ¶ 2 |
| **Liens on Chapter 5 Actions**<br><br>*Local Bankruptcy Rule 4001-2(a)(i)(D)* | The Lender shall have a lien on causes of action under Section 549 of the Bankruptcy Code. | Interim Order, ¶ 10 |
| **Milestones**<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B)(vi) and (c)(1)(B)* | Within the time periods set forth below, the Debtor shall perform each action with respect to the Case including, without limitation, the Milestones set forth below, subject to waiver by consent of the DIP Lender:<br>• As soon as practicable, but in any event within the 30 days immediately following the Petition Date, either (i) executing a sale agreement with a stalking   horse bidder relating to the sale of, or substantially  all of Debtor's assets, and filing a sale motion and  bidding procedures motion relating to such sale   with the Bankruptcy Court, or (ii) filing a bidding  procedures motion and an auction sale motion with  the Bankruptcy Court to implement bidding   procedures for a sale of substantially all of Debtor's assets without a stalking horse bidder;<br>• Within 60 days of the Petition Date, obtain entry of  an order approving bidding procedures for a sale of   substantially all of the Debtor's assets;<br>• Within 90 days of the Petition Date, identify a winning bidder or other purchaser for all or substantially all of the Debtor's assets;<br>• Within 120 days of the Petition Date, obtain Bankruptcy Court approval of and close a sale of substantially all of the Debtor's assets. | Interim Order, ¶ 14 |

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| **Carve-Out**<br><br>*Local Bankruptcy Rule 4001-2(a)(i)(F)* | Carve-Out. For purposes of the Interim Order, the "Carve-Out" shall mean the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all allowed and unpaid professionals fees, expenses and disbursements incurred prior to the Termination Date (whenever allowed) by (x) professionals of the estates retained by order of the Court ("Estate Professionals") up to the amount provided for such Estate Professionals in the Budget and (y) professionals of a Creditors Committee retained by order of the Court ("Creditors Committee Professionals" and, together with the Estate Professionals, the "Case Professionals"), if any, up to the amount provided for such Creditors Committee Professionals for such period in the Budget (this clause (ii) being referred to as the "Pre-Termination Date Carve-Out"); and (iii) the allowed and unpaid professional fees, expenses and disbursements under section 327 or 1103(a) of the Bankruptcy Code incurred on or after the Termination Date, in the aggregate not to exceed $75,000 for Estate Professionals and $30,000 for Creditors Committee Professionals (this clause (iii) being referred to as the "Post-Termination Date Carve-Out"). | Interim Order, ¶ 24 |
| **Cross-Collateralization**<br><br>*Local Bankruptcy Rule 4001-2(a)(i)(A)* | None. | |
| **Findings re Validity/ Perfection/Amount**<br><br>*Local Bankruptcy Rule 4001-2(a)(i)(B)* | Not applicable. | |
| **Challenge Period**<br><br>*Local Bankruptcy Rule 4001-2(a)(i)(B)* | Not applicable. | |
| **506(c) Waiver**<br><br>*Local Bankruptcy Rule 4001-2(a)(i)(C)* | Upon entry of a final order. | Interim Order, ¶ 23 |
| **552(b) Waiver**<br><br>*Local Bankruptcy Rule 4001-2(a)(i)(H)* | Upon entry of a final order. | Interim Order, ¶ 23 |
| **Releases**<br><br>*Local Bankruptcy Rule 4001-2(a)(ii)* | None. | |

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| **Provisions Deeming Prepetition Debt to be Postpetition Debt**<br><br>*Local Bankruptcy Rule 4001-2(a)(i)(E)* | None. | |
| **Non-Consensual Priming**<br><br>*Local Bankruptcy Rule 4001-2(a)(i)(B)* | None. | |

57.    It is essential to the Debtor's successful reorganization and the going concern value of its business that it has sufficient funds to operate in the ordinary course of its business. Absent access to debtor-in-possession financing, the Debtor will not have sufficient working capital to (a) make payments to employees, (b) satisfy ordinary operating costs, including the payment of JIBs and royalties, and (c) fund the administrative costs of this chapter 11 case.

**B.    Motion For Entry Of An Order (I) Authorizing The Debtor To Continue Prepetition Insurance Policies And Practices; and (II) Continuing Bond Coverage ("Insurance Motion")**

58.    In connection with the operation of its business, the Debtor currently maintains numerous insurance policies and programs providing coverage for, among other things, the following: General Liability, Pollution, and Well Control, and certain excess liability coverages (collectively, the "Insurance Programs"). The Debtor's Insurance Programs are maintained with several different insurance carriers (the "Insurance Carriers") and include, but are not limited to, those Insurance Programs identified on Exhibit A attached to the Insurance Motion.

59.    The Insurance Programs are essential to the preservation of the value of the Debtor's business, property, and assets. In many cases, insurance coverage such as that provided by the Insurance Programs is required by the diverse regulations, laws, and contracts that govern the Debtor's commercial activities.

60.     The annual premiums for the Debtor's current Insurance Programs total approximately $87,384.   As of the Petition Date, the Debtor believes it is current on its insurance premiums.  To the extent that any insurance premium payments become due during the pendency of the bankruptcy case, the Debtor will include those amounts in the DIP budget and fund the payments with its debtor-in-possession financing, which is the subject of a separate motion as discussed above.

61.     The Debtor employs insurance brokers, Wortham Insurance Brokers and Marsh Insurance Brokers (the "Insurance Broker"), to assist with the procurement and negotiation of the Insurance Programs.   The Broker earns commissions for its services (the "Insurance Broker Commission"), which is paid as part of the annual premium for the Insurance Programs.  While the Debtor believes that payment of the Insurance Broker Commission post-petition would simply be a payment in the ordinary course of business for post-petition services, out of an abundance of caution, the Debtor seeks authority for the Insurance Broker Commission to be paid (including any outstanding as of the Petition Date) in the ordinary course of business.

62.     In the ordinary course of business, the Debtor procures bonds (collectively, the "Bonds"), including without limitation, bonds to secure Debtor's performance of decommissioning obligations, for the benefit of third-party beneficiaries.   Debtor may be required to purchase the Bonds in connection with services performed by the Debtor or as required by state and local law.  The Bonds are thus vital for the maintenance of the Debtor's business.  As of the Petition Date, the Debtor has five bonds in place and believes that it has paid all premiums due and owing on the Bonds.  However, the Debtor seek permissions to renew the Bonds or, as necessary, procure new Bonds postpetition in the ordinary course of business, and pay premiums related thereto.

**C.    Emergency Motion For Entry Of An Order Under 11 U.S.C. §§105, 363, 364, 1107 And 1108 Authorizing Maintenance Of Existing Bank Accounts, Continued Use Of Existing Business Forms And For Related Relief ("Bank Account Motion")**

63.    Prior to the Petition Date, the Debtor, in the ordinary course of business, maintained active accounts at Wells Fargo Bank, N.A. (the "Bank").  Those accounts are:

| Account Number | Account Name | Purpose |
|---|---|---|
| *****4619 | Operating Account | Demand deposit account for cash receipts & payables |
| *****4635 | Royalty Account | Demand deposit account for payment of royalty obligations |
| *****4627 | Payroll Account | Demand deposit account for payroll |

The Debtor utilizes the Operating Account (account number ending in 4619) to receive payments on oil and gas receivables. The Debtor utilizes the Payroll Account (account number ending in 4627) for payment of payroll and tax withholdings. The Debtor utilizes the Royalty Account (account number ending in 4635) for payment of royalty obligations associated with the oil and gas revenues to royalty owners and other working interest owners.

64.    The Payroll and Royalty accounts are funded from the Operating Account for payment of payroll and royalty obligations.

65.    The Debtor seeks a waiver of the UST's requirement that the Accounts be closed and new postpetition accounts be opened. If enforced in these cases, the requirement would cause undue disruption to the Debtor's business operations. In order to ensure an orderly transition into chapter 11 and to maintain smooth collections and disbursements in the ordinary course, the Debtor needs to be able to continue to issue checks to vendors, service providers, employees and others. Changing from the current Accounts would create delays and additional expense.

66.     A waiver of the account closing requirement is necessary here. Subject to a prohibition against honoring prepetition checks without specific authorization from this Court, the Debtor requests that the Accounts be deemed debtor-in-possession accounts and that the Debtor be authorized to maintain and continue the use of these Accounts in the same manner and with the same Banks, account numbers, styles, and document forms as those employed during the prepetition period.

67.     To minimize expense to their estates, the Debtor also requests authority to continue to use all correspondence and business forms (including, but not limited to, letterhead, purchase orders, invoices, etc.), as well as checks and bookkeeping records existing immediately before the Petition Date, without reference to their status as debtors-in-possession.

68.     In the ordinary course of business, Debtor, along with other affiliates, leases space from a parent company.  The Debtor also participates in certain insurance policies that insure the Debtor along with other affiliates and employee benefit plans that cover the employees of the Debtor and other affiliates.  The Debtor pays its allocable share of the rent, premiums and other shared expenses through intercompany transactions and transfers (collectively, the "Intercompany Transactions") on a monthly basis pursuant to invoices issued by an affiliate. The Intercompany Transactions, and the attendant efficiencies of scale, require a centralized cash management system.

69.     The Intercompany Transactions are made between and among the Debtor and the affiliate in the ordinary course of the company's business as part of its cash management system. The Debtor maintains records of all fund transfers and can ascertain, trace and account for Intercompany Transactions.  If these transactions were to be discontinued, the Debtor's cash

management system, and related administrative controls would be disrupted, all to the detriment of the Debtor.

70.     Because such transactions are common among similar enterprises, the Debtor believes that Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtor is seeking express authority to engage in such transactions on a postpetition basis.

**D.      Motion For Entry Of Interim And Final Orders (I) Authorizing Payment Of Wages And Employee Benefits; And (II) Directing Financial Institutions To Honor And Process Checks And Transfers Related To Such Obligations ("Wages Motion")**

71.     In the ordinary course of their business, the Debtor incurs payroll and various other obligations and provide other benefits to its employees for the performance of services.  As of the Petition Date, Debtor employed approximately five (5) employees, including both full time and part time employees, with some employees salaried and others paid on an hourly basis (collectively, the "Employees").

72.     The Debtor has costs and obligations with respect to the Employees relating to the period prior to the Petition Date.  Certain of these costs and obligations are outstanding and due and payable, while others will become due and payable in the ordinary course of the Debtor's business after the Petition Date.

73.     Finally, the Debtors request authorization to modify the Automatic Stay to permit employees with valid workers' compensation claims to pursue those claims under the Workers' Compensation Program (as defined herein).

74.     Prior to the Petition Date and in the ordinary course of business, the Debtor typically paid obligations relating to wages, salary and compensation for the Employees

(collectively, the "Wage Obligations") through direct deposits into Employees' accounts on a bi-weekly basis (paid every other Friday).[7]   The Debtor's current estimated monthly gross payroll (including tax and other withholding) is approximately $26,400.00.   Following the Debtor's customary payroll schedule, the next payroll is due to be paid on April 28, 2017.   This payroll will be almost entirely for prepetition Wage Obligations.

75.     The Debtor issued paychecks to Employees on April 14, 2017.   However, the Debtor believes that not all such paychecks have been cashed yet, and seek permission to direct the Bank (as defined herein) to honor such paychecks.

76.     The Debtor seeks to be authorized, but not required, to pay any outstanding Wage Obligations due and owing up to $30,000, and to pay all Wage Obligations that arise post-petition in the ordinary course of business.

77.     The Debtor is required by law to withhold from the Wage Obligations amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "Withholding Taxes") and to remit the same to the appropriate taxing authorities (collectively, the "Taxing Authorities").   In addition, the Debtor is required to make matching payments from their own funds on account of social security and Medicare taxes and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholding Taxes, the "Payroll Taxes").   The Debtor requests the authority to pay these Payroll Taxes in the ordinary course of business.

78.     The Debtor remits most of the Payroll Taxes to the Taxing Authorities on a quarterly basis. As of the Petition Date, the Debtor was current on its Payroll Taxes obligations

---

[7] Employees are paid in arrears, for work performed in the previous week[s].

due for past quarters but are accruing additional amounts due for next quarter.   The Debtor seeks authority to pay these prepetition, outstanding Payroll Taxes in the ordinary course of business.

79.     <u>Payroll Processing Fee.</u>  Payments to the Employees are handled on a centralized basis and with the assistance of a third party payroll processor, Paycom. A day before payday, the Debtor's payroll account is funded with enough money to cover payroll for the pay period. Paycom calculates the payroll obligations, handles direct deposits, prints the checks for Employees who elect to receive paychecks, sends the checks to the Debtor for distribution to Employees, and pays payroll taxes and other applicable deductions required by law. Paycom charges a nominal fee of approximately $725 per month for this service. The Debtor estimates that it owes Paycom approximately this amount for accrued prepetition amounts, and the Debtor seeks authorization to pay this nominal amount to Paycom.

80.     In the ordinary course of business, the Debtor has established various benefit plans and policies for their Employees, which can be divided into the following categories (collectively, the "<u>Employee Benefits</u>"): (1) medical, dental, vision, life, long term, and short term disability (collectively, the "<u>Health and Welfare Plans</u>"); (2) paid discretionary time off, including vacation and sick days (collectively, "<u>Discretionary Time</u>"); and (3) the 401(k) retirement plan (the "<u>401(k) Plan</u>").

81.     The Debtor deducts specified amounts from the Employees' wages in connection with certain of the Employee Benefits, such as medical insurance, dental insurance, life insurance and 401(k) Plan contributions.

82.     The Debtor offers health and welfare benefits to all of its full-time Employees. The health insurance benefits include medical, dental and vision insurance (the "<u>Health Insurance Benefits</u>").   The Health Insurance Benefits are provided through group policies

maintained by an affiliate (the "Affiliate") and the Debtor pays its allocable share of the premiums to the Affiliate monthly through intercompany transfers.

83.     The Debtors' medical coverage is provided through medical self-insurance by the Affiliate and administered by HealthScope.  Guardian administers the Debtor's fully-insured dental and vision plans. The Debtor will owe the Affiliate approximately $4,300 on account of the Health Insurance Benefits ( in addition to employee contributions of approximately $2,200) for April 2017, most of which is attributable to the period prior to the Petition Date.  Payments for subsequent months will become due each month after the Petition Date.

84.     The Debtor provides basic life insurance for its Employees in addition to accidental death and dismemberment coverage ("Life Insurance Plans") through a group policy issued by The Prudential Company of North America to the Affiliate.  The Debtor provides long-term disability, accidental, and critical illness insurance (the "Disability Plans") through a group policy issued by Provident Life & Accident Insurance Company to the Affiliate.  The Debtor pays its allocable share of the premiums for the Life Insurance Plans and Disability Plans to the Affiliate on a monthly basis through intercompany transfers.  When invoiced, the Debtor will owe the Affiliate approximately $205.00 for its allocable share of the premiums for the Life Insurance Plans and Disability Plans for April 2017, most of which is attributable to the period prior to the Petition Date.  Payments for subsequent months will become due each month after the Petition Date.

85.     Under the Discretionary Time plan, Employees are eligible, in certain circumstances, to receive their full wages for, among other things, vacation and other paid time off ("Discretionary Time").  The Employees earn their annual Discretionary Time based on their length of service.  Generally, under the Debtor's Discretionary Time policy, Discretionary Time

is accrued over time and is not a current cash payment obligation as to Employees.  As such, most Employees will receive their vacation time as paid time off in the ordinary course of business (and not as a cash payment).  However, the Debtor may pay earned but unused Discretionary Time to certain Employees in certain circumstances.  The Debtor seeks authority to pay Discretionary Time, including earned but unused Discretionary Time, in the ordinary course of business.

86.    The Debtor, through an affiliate, coordinates and makes available to Employees the 401(k) Plan, through which participating Employees can elect to withhold a portion of their wages (the "401(k) Contributions") to contribute toward a 401(k) plan.  In addition, the Debtor makes matching 401K contributions.  On a monthly basis, the Debtor remits the 401(k) Contributions plus its allocable share of administration fees to the affiliate through an intercompany transfer.  When invoiced, the Debtor will owe its affiliate approximately $1,350.00 on account of 401K matching contributions (in addition to employee contributions of approximately $4,800.00) for April 2017.  The Debtor seeks permission to make contributions to the 401(k) Plan, to pay its allocable share of administration fees, and to provide 401(k) matching contributions though intercompany transfers in the ordinary course of business.

87.    One Employee receives a car allowance of $200.00 per pay period.  The Debtor requests authority to pay this car allowance in connection with the April 28, 2017 payroll and continue to pay the car allowance in the ordinary course of business.

88.    Under the laws of the states in which it operates, the Debtor is required to maintain for its Employees workers' compensation coverage for claims arising from or related to their employment with the Debtor (the "Workers' Compensation Insurance").  The Workers' Compensation Insurance is provided through a policy maintained by an affiliate and the Debtor

26

pays its allocable share of the premiums to the affiliate monthly through intercompany transfers. When invoiced, the Debtor will owe its affiliate approximately $400.00 for its allocable share of the Workers' Compensation Premiums and seeks authority to this amount by intercompany transfer when due.  Further, the Debtor seeks authority to pay its allocable share of Workers' Compensation Premiums that accrue subsequent to the Petition Date in the ordinary course of business.

**E.    Motion for Entry of an Order  (I) Authorizing the Debtor to Pay Royalty and Working Interest Obligations, Lease Operating Expenses, JIBs, and Potential Holders of Statutory Liens, and (II) Granting Related Relief**

89.    While Debtor has recently completed plugging and abandonment operations on the wells associated with the leases it operates, the Debtor continues to have lease operating expenses associated with preserving the leases and certain equipment associated with the leases (the "Lease Expenses").

90.    In addition, as a result of its ownership interests, Debtor receives payments from oil and gas production that are subject to other royalty and working interests (the "Mineral Interests").  On April 19, 2017, the Debtor paid—from the revenues it received-- approximately $11,000 in royalty obligations for the month of March 2017, to thirty-six royalty owners.

91.    .Debtor also receives joint interest billings ("JIBs") which must be paid to maintain lease operations and allow Debtor's revenue streams to continue.  Debtor estimates it owes JIBs of approximately $420,000 by April 24, 2017, with additional JIBs of approximately $100,000 to $150,000 coming due in the approaching months.

92.    Debtor is also subject to potential 503(b)(9) claims and statutory lien claims from contractors who worked on the wells it operated and recently plugged and abandoned, or who provided services to the Debtor to preserve and maintain its Leases (the "Potential Lien Claimants").  Debtor believes that the obligations to third parties from its plugging and

abandonment obligations have largely been paid, but given that the work was completed in the last thirty days, it may receive additional invoices for this work.

93.    The Debtor believes that its obligations for Lease Expenses, Mineral Interests, JIBS, and Potential Lien Claims (collectively, the "Obligations") should be paid as they come due, in order to preserve the Debtors' interest in the Leases, maintain its relationship with vendors who service them, and avoid unnecessary costs and expenses in connection with the administration and preservation of the estate.   The failure to pay JIBS and royalty payments may not only jeopardize the Debtor's working interests and its future revenues but may also create additional administrative obligations for the estate.   Similarly, potential lien claims, if not addressed in the ordinary course, will create greater administrative expense due to their impact on third parties and the additional procedures necessary to resolve lien claims.

94.    For these reasons, it is necessary and beneficial to the estate to pay these Obligations in the ordinary course as they come due.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Executed on April 21, 2017

By:*/s/ John Riney*
Name: John Riney
Title: President, Adams Resources
Exploration Corporation